UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS MOORE,                          :
                                       :
          Plaintiff,                   :CIVIL ACTION NO. 3:12-CV-223
                                       :
          v.                           :(JUDGE CONABOY)
                                       :(Magistrate Judge Mehalchick)
MORIROSA LAMAS, et al.,                :
                                       :
          Defendants.                  :
                                       :

_____

**MEMORANDUM**

     Here the Court considers the Report and Recommendation
concerning the issue of exhaustion of administrative remedies in
the above-captioned action.  (Doc. 93.)  After conducting two
evidentiary hearings and considering extensive post-hearing
briefing and related documents, Magistrate Judge Karoline
Mehalchick concluded that Plaintiff's Amended Complaint (Doc. 28)
should be dismissed with prejudice for failure to exhaust
administrative remedies pursuant to the Prison Litigation Reform
Act ("PLRA").  (Doc. 93 at 15.)

     Plaintiff timely filed his objections to the Report and
Recommendation and supporting brief on June 6, 2017.  (Docs. 94,
95.)  Multiple responsive filings followed.  (Docs. 96, 97, 101.)
After carefully considering the matters raised with Plaintiff's
objections, the Court adopts the Report and Recommendation in part
but concludes that Defendants have not met their burden of showing
that all of Plaintiff's claims must be dismissed for failure to
exhaust administrative remedies.

Plaintiff's prolific filings to prison/Department of Corrections ("DOC") officials regarding multiple claims and the unsettled state of the law on some relevant issues complicate the presentation of facts and analysis of the exhaustion of administrative remedies at issue in this case. However, the importance of the exhaustion inquiry and the record created in this matter counsels against truncated consideration of the evidence and issues presented. For the sake of more concise presentation of key facts, the Court uses appendixes to present details relevant to pertinent matters outlined in the Background section of the Memorandum.

## I. Background

### A.   *Procedural Background*

Plaintiff initiated this 42 U.S.C. § 1983 action *pro se* on February 6, 2012, naming as Defendants SCI-Rockview Unit Manager Kenny Granlund, Warden Marirosa Lamas, and Deputy Warden Jeff Horton.[1] (Doc. 1.) Plaintiff's allegations of wrongdoing relate to his incarceration at SCI-Rockview in 2010 and 2011. (*See* Doc. 28.) He was transferred from SCI-Rockview to SCI-Albion on December 19, 2011. (Doc. 28 ¶ 62.)

Plaintiff filed a counseled Amended Complaint on February 13, 2013, in which he named the Commonwealth of Pennsylvania Department

---

[1]  Defendant Lamas is identified as "Morirosa" in this filing but is subsequently referred to as "Marirosa." (*See*, *e.g.*, Doc. 1 at 1, Doc. 28 at 2; Doc. 63-1 at 53.)

of Corrections, and Defendants Granlund and Lamas as well as four additional defendants: Rockview corrections officers Perks, Hall, and Fisher, and Lynn Eaton, identified as a prison guard supervisor.[2] (Doc. 28 at 2.) The Amended Complaint contains four counts: Count One, Civil Rights Violation/Retaliation against all Defendants; Count Two, Civil Rights Violations against Defendant Lamas for failure to establish appropriate policies, practices, or customs, and for sanctioning an alleged "cover up"; Count Three, Assault and Battery against Defendant Granlund; and Count Four, False Imprisonment and Conspiracy, against all Defendants. (Doc. 28 at 7-9.)

Defendants filed a Motion to Dismiss (Doc. 35) which was granted in part (Doc. 40). With the disposition of the motion, the following claims remain: 1) the claim that Defendant Granlund engaged in improper sexual contact with Plaintiff during the fall of 2010; 2) the claim that Defendant Granlund physically assaulted Plaintiff on December 6, 2010, when he struck Plaintiff in the mouth; 3) conditions of confinement claims while in the RHU including the lack of heat and food deprivation the claim that Defendants Hall, Perks, and Fisher mopped chemical cleaning fluid into Plaintiff's cell on February 19, 2011; 4) and claims of retaliation against Defendant Granlund. (Docs. 39, 40.)

---

[2] Previously named Defendant Horton is not a named defendant in the Amended Complaint. (*See* Doc. 28.)

Defendants filed an Answer (Doc. 43) and subsequently filed Defendants' Motion for Summary Judgment (Doc. 57) following a period of discovery. In their supporting brief, Defendants Lamas, Eaton, Granlund, Perks, Hall, and Fisher identified the remaining claims to be sexual abuse, physical assault and retaliation against Defendant Granlund, and conditions of confinement in the RHU claims against Defendants Lamas, Eaton, Perks, Hall, and Fisher. (Doc. 58 at 1.) With their motion, Defendants asserted that entry of summary judgment was appropriate because Plaintiff had failed to exhaust his available administrative remedies. (*See* Doc. 58 at 4.) In his response to the motion, Plaintiff included a cross-motion seeking entry of partial summary judgment on the sexual abuse claim. (*See* Doc. 63.) After concluding that the representations made by the parties regarding administrative exhaustion involved credibility issues which needed to be resolved before the matter could proceed, the Court found that it was precluded from granting the pending summary judgment requests and that an evidentiary hearing on the exhaustion issue was warranted. (Doc. 70 at 8-9.) Thus, by Order of March 10, 2016, the Court denied the parties' pending motions (Docs. 57, 63), and referred the matter to Magistrate Judge Karoline Mehalchick for the purpose of conducting an evidentiary hearing on the exhaustion issue. (Doc. 70 at 9.)

As noted above, Magistrate Judge Mehalchick conducted two evidentiary hearings (Docs. 81, 83) and considered extensive post-

hearing briefing (Docs. 84-91) and related documents. She concluded in the Report and Recommendation that Plaintiff failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), his failure to exhaust is not excused, and Plaintiff's Amended Complaint (Doc. 28) should be dismissed with prejudice (Doc. 93 at 15).

Plaintiff objects to the findings that he had not exhausted available administrative remedies, that he did not exhaust his remedies pursuant to DC-ADM 001, and that the alleged failure to exhaust was not excused under relevant substantive and procedural law. (Doc. 94 at 1-2.) He also objects to the discussion of legal authority in the context of summary judgment and the recommendation of relief in the form of a motion to dismiss the complaint. (*Id.* at 2.)

In Defendants' Brief in Opposition to Plaintiff's Objections to the Report and Recommendation, Defendants note that they "may not agree with the entire R & R as written," but the Report and Recommendation was correct in finding that Plaintiff did not exhaust available administrative remedies under DC-ADM 804 and such failure is not excused, and it was correct in finding that reporting abuse under DC-ADM 001 does not constitute exhaustion. (Doc. 96 at 3.)

**B.    *Pennsylvania Department of Corrections and SCI-Rockview Policies and Procedures***

The Pennsylvania Department of Corrections ("DOC") Inmate Handbook provides inmates with information about how to raise and

5

resolve problems through various channels.[3]  (*See*, *e.g.*, DOC Inmate

Handbook, 2017 Edition,

www.cor.pa.gov/.../Documents/DOC%20Policies/2017%20DOC%20Inmate%20H

andbook at 6-10.)  Policies at issue in this case include DC-ADM

804 concerning the Inmate Grievance System and DC-ADM 001

concerning Inmate Abuse.  Here the Court summarizes the most

relevant aspects of the policies and compares/contrasts the

policies as pertinent to the matters at issue.  Significant

provisions of the policies are set out in greater detail in

Appendix 1 attached to this Memorandum.  Testimony regarding their

use and interaction is set out in the Discussion section of the

Memorandum.

**1.   DC-ADM 804**

The subject of the Pennsylvania Department of Corrections

policy number DC-ADM 804 is "Inmate Grievance System."  (Doc. 60-2

at 5.)  A new DC-ADM 804 Policy Statement became effective on

December 8, 2010, replacing the DC-ADM 804 Policy Statement which

_____

[3]  Though referenced at the Evidentiary Hearing held on April
29, 2016, (*see*, *e.g.*, Doc. 83 at 20, 105), the Court has reviewed
exhibits of record (Docs. 60, 63-1, 65, 68, 82, 89-1, 91-1, 95-1)
and does not find the Inmate Handbook provided to Plaintiff in the
record.  Because relevant policies have changed since Plaintiff
raised the concerns at issue in this case, the Court cannot
definitivley do more than generally note that testimony indicates
the Inmate Handbook contained information which was intended to
explain to the inmate how to resolve problems and use the grievance
system.  (*Id.* at 106.)  Notwithstanding this caveat, current
handbook instructions may be referenced in the Discussion section
of the Memorandum if arguably illustrative of relevant issues.

6

became effective on January 3, 2005. (*See* Doc. 60-1; Doc. 60-2.) Although some of Plaintiff's allegations predate December 8, 2010, the DC-ADM 804 grievances which the Court considers relevant to the disposition of the matters at issue at this stage of the proceedings were filed after December 8, 2010, so only the later version of the policy is cited here.

DC-ADM 804 is a multi-level procedure by which an inmate can formally present a concern to prison and DOC officials in a strictly prescribed manner. Through detailed mechanisms, the inmate receives a Greivance Rejection Form enumerating the reason(s) the grievance was rejected or an Initial Review Response explaining the disposition of his grievance (Doc. 60-2 at 12); the receipt of either of these triggers the inmate's right to appeal the initial disposition to the Facility Manager (*id.* at 15); and the receipt of the Facility Manager's response allows the inmate to appeal to Final Review to the DOC's Secretary's Office of Inmate Grievances and Appeals ("SOIGA") (*id.* at 17).

## 2. DC-ADM 001

The subject of the Pennsylvania Department of Corrections policy number DC-ADM 001 is "Inmate Abuse."[4]   (DC-ADM 001 at 1.)

---

[4]   Policy number DC-ADM 001 in effect at the relevant time period is not contained in the record now before the Court. (*See* Docs. 60, 63-1, 65, 68, 82, 89-1, 91-1, 95-1.) Plaintiff avers that the DC-ADM 001 in effect at the time of Plaintiff's allegations was effective September 29, 2005. (Doc. 95 at 10.) The Report and Recommendation notes that the version of the DC-ADM 001 Procedures Manual effective September 29, 2005, was the

It contains the following policy statement: "It is the policy of the Department to ensure than an inmate is not subjected to corporal or unusual punishment, or personal abuse or injury."[5]

DC-ADM 001 lacks the strict filing provisions of DC-ADM 804, including the time for filing--DC-ADM 001 has no time limit for

---

operative policy in effect at the relevant time. (Doc. 93 at 6 n.5.) At the April 6, 2016, evidentiary hearing, Defendants' counsel requested that, for evidentiary purposes, the Court take judicial notice of DC-ADM 001 on the public website as a basis for consideration of Defendants' argument and the Court agreed to do so. (Doc. 81 at 62-63.) At the April 29, 2016, evidentiary hearing, the OSII supervising criminal investigator, Harold Kertes, testified that in 2010-2011, DC-ADM 001 covered "excessive force of an inmate by staff, an articulated oral or written threat of physical injury to an inmate by staff, an unwarranted life threatening act or sexual contact with an inmate by staff. The sexual contact has since been removed and covered under [DC-ADM 008]." (Doc. 83 at 97.) He also testified that the Office of Professional Responsibility ("OPR") changed to the Office of Special Investigations and Intelligence ("OSII") around 2010 or 2011. (Doc. 83 at 89-90.)

The DC-ADM 001 Policy Statement regarding Inmate Abuse effective November 24, 2014, which is presumably the policy referenced at the evidentiary hearing in the judicial notice discussion (Doc. 81 at 62-63), is the document currently available on the website which the Court reviews here as relevant to claims of physical and sexual abuse. *See* www.cor.pa.gov/.../Documents/DOC%20Policies/001%20Inmate%20Abuse.pdf. The Court does so because the parties do not assert that *procedures* have substantively changed since the relevant time. Hereafter, the current policy will be cited as "DC-ADM 001" with reference to the identified PDF page numbers.

[5] The current Inmate Handbook contains a section outlining DC-ADM 001 which begins with the statement that "[t]he Department does not permit any inmate to be subjected to abuse. All allegations of abuse are thoroughly investigated." www.cor.pa.gov/.../Documents/DOC%20Policies/2017%20DOC%20INmate%20Handbook at 6.

reporting an allegation of abuse.[6]  The policy provides multiple
ways for an inmate to report abuse: he can report it verbally or in
writing to any staff member, file a DC-ADM 804 grievance, or report
it in writing to the Department's Office of Special Investigations
and Intelligence (OSII).  (DC-ADM 001 at 1-1.)  A facility employee
who receives a written or verbal notification of an incident of
abuse must report it to the Security Office and an Central Office
employee who receievees such a notification must report it to OSII.
(DC-ADM 001 at 1-2.)

In all cases, an investigation ensues and is conducted either
by the Security Office or OSII.  (*Id.*)  DC-ADM 001 includes
detailed provisions as to the timing, content, and review of
investigations.  (DC-ADM 001 at 1-2 through 1-5.)  It also provides
the manner in which the inmate is to be notified of the results of
the investigation: if the Security Office conducted the
investigation, it is tasked with doing so and, if OSII conducted
the investigation, OSII informs the inmate by letter.  (DC-ADM 001
at 1-5.)

---

[6]  In the later-adopted DC-ADM 008 which addressed sexual
abuse and sexual harassment of an inmate, the "Methods of Reporting
for Inmates" section of the Procedures Manual states that an inmate
who is an alleged victim of sexual abuse, sexual harassment, and/or
retaliation for reporting sexual abuse and harassment is to report
it "to a staff member as soon as possible."
www.cor.pa.gov/.../Documents/DOC%20Policies/008%20Prison%20Rape20%E
limination20%Act.pdf Aug. 22, 2016 at 3-2.  Other methods of
reporting do not specify a time component.  (*Id.*)

**3.   Interaction of DC-ADM 804 and DC-ADM 001**

DC-ADM 804 states that allegations of abuse "shall be" handled according to DC-ADM 001 and adds that

> [t]his may extend the time for responding to the grievance, but will not alter the inmate's ability to appeal upon his/her receipt of the Initial Review Response.  When a grievance is related to an allegation of abuse and the grievance is the first notice made by the inmate to the Security Office, the Security Office is afforded 30 working days to respond to the initial grievance as opposed to the normal 15 working days due to the need for investigation.

(Doc. 60-2 at 12.)

DC-ADM 001 contains a provision which applies to a complaint of abuse made by filing a grievance under DC-ADM 804:

> A grievance dealing with allegations of abuse shall be handled in accordance with this procedures manual.  This may extend the time for responding to the grievance, but will not alter the inmate's ability to appeal upon his/her receipt of the Initial Review Response.  When a grievance is related to an allegation of abuse, the Grievance Coordinator will issue an Extension Notice to the inmate by checking the box "Notice of Investigation."  The initial review response will be completed by the assigned Grievance Officer when the results from the OSII are received.  If the Grievance is not in compliance with Department Policy DC-ADM 804, "Inmate Grievance System," the rejected grievance will be forwarded to the facility Security Office so an investigation can be initiated.
>
> . . . .
>
> Inmate grievances alleging abuse that are sent directly to the Central Office shall

10

be forwarded to the OSII.

(DC-ADM 001 at 1-1.)

## *C. Factual Background*

Details related to factual allegations and filings are set out in detail in Appendix 2 attached to this Memorandum. Only a brief summary of relevant matters is included here.

## 1. <u>Sexual Abuse Allegations</u>

Plaintiff alleges that Defendant Granlund engaged in improper sexual contact with him on several occasions in the fall of 2010.[7] (Doc. 28 ¶ 12.) He raised several verified sexual abuse allegations--through DC-ADM 804 grievances which were filed after the prescribed time (*see*, *e.g.*, Doc. 60-6 at 16), through multiple Inmate's Request To Staff (*see*, *e.g.*, Doc. 63-1 at 33), and through direct communication with DOC officials and OSII (*see*, *e.g.*, Doc. 63-1 at 51). DC-ADM 001 was specifically mentioned in some of these documents.

SCI-Rockview and OSII personnel confirmed that Plaintiff raised claims of sexual abuse by Defendant Granlund. (Doc. 81 at 31; Doc. 83 at 98.) No investigation of sexual abuse allegations is documented in the record. The only response to Plaintiff specifically referenced in the record is a July 7, 2011, entry in the OSII Tracking Summary which contains a notation that a letter

---

[7] In his August 20, 2015, Declaration, Defendant Granlund denied all allegations against him. (Doc. 68 at 10-11.)

was sent to Plaintiff informing him that his claims "were investigated and unsubstantiated." (Doc. 63-1 at 51.)

## 2. **December 2010 Physical Abuse Allegations**

Plaintiff timely filed DC-ADM 804 grievances alleging that Defendant Granlund physically abused him by punching him in the mouth on December 6, 2010. (Doc. 60-6 at 12, 14.) In January 2011, Plaintiff was informed by the assigned Grievance Officer, Defendant Eaton, by way of Initial Review Responses that the allegations were being investigated pursuant to DC-ADM 001. (*Id.* at 13, 15.) The Grievance Chart indicates the grievances were denied in January 2011 with no further action noted. (Doc. 60-5 at 2.)

The record shows that SCI-Rockview officials investigated the physical abuse allegations. (Doc. 68 at 4.) After inquiring about the results of the investigation and grievances on multiple occasions to both SCI-Rockview officials and OSII (*see*, *e.g.*, Doc. 63-1 at 22, 42-43), Plaintiff never received definitive responses from SCI-Rockview personnel. The only indication that the investigation was completed and reviewed was the OSII Tracking Summary entry of July 7, 2011, which referenced the letter to Plaintiff noted above.[8] (Doc. 63-1 at 51.)

## 3. **February 2011 Abuse Allegations**

Plaintiff timely filed a DC-ADM 804 grievance alleging that

---

[8] The letter itself is not contained in the record.

Defendants Hall, Perks, and Fisher poured chemicals under his cell door and cut off circulation in his cell on February 19, 2011, which caused him to become ill and require medical attention. (Doc. 60-6 at 24.)  The record contains a Grievance Withdrawal Form for this grievance signed by the assigned Grievance Officer, Lieutenant Gregory Dyke.  (*Id.* at 25.)  The Grievance Chart does not indicate that the grievance was withdrawn.  (Doc. 60-5 at 2.)

Plaintiff testified that Lt. Dyke asked him to withdraw the grievance but he refused and Lt. Dyke then said he would take care of it himself.  (Doc. 83 at 60-62.)  Lt. Dyke testified that Plaintiff withdrew the grievance but he did not recall any details. (Doc. 81 at 55.)  Other evidence of record shows that Grievance Coordinator Rackovan continued to refer to the grievance as reviewed, the review was received by Plaintiff, and the review was appealable.  (Doc. 60-6 at 29, 32-33.)

An April 4, 2011, Tracking System Summary entry states that the matter was being investigated (Doc. 63-1 at 51), but the record contains no evidence of an investigation into the February 19, 2011, incident.

**4.   Conditions of Confinement Claims**

Plaintiff alleges that he was denied food on multiple occasions while in the RHU and he filed DC-ADM 804 grievances about this in February 2011.  (Doc. 60-6 at 22, 24.)  The first grievance was denied. (Doc. 60-6 at 23.)  The second grievance also contained

13

the February 19, 2011, chemical incident allegations and, as discussed above, was allegedly withdrawn.  (Doc. 60-6 at 25.)

## II. Discussion

Plaintiff objects to the findings in the Report and Recommendation that he did not exhaust available administrative remedies, he did not exhaust his remedies pursuant to DC-ADM 001, and the alleged failure to exhaust was not excused under relevant substantive and procedural law.  (Doc. 94 at 1-2.)  He also objects to the discussion of legal authority in the context of summary judgment and the recommendation of relief in the form of a motion to dismiss the complaint.  (*Id.* at 2.)

When a magistrate judge makes a finding or ruling on a motion or issue, his determination should become that of the court unless objections are filed.  *See Thomas v. Arn*, 474 U.S. 140, 150-53 (1985).  When no objections are filed, the district court is required only to review the record for "clear error" prior to accepting a magistrate judge's recommendation.  *See Cruz v. Chater*, 990 F. Supp. 375, 378 (M.D. Pa. 1998).  When objections are filed, the district judge makes a *de novo* review of those portions of the report or specified proposed findings or recommendations to which objection is made.  *See Cippolone v. Liggett Group, Inc.*, 822 F.2d 335, 340 (3d Cir. 1987), *cert. denied*, 484 U.S. 976 (1987).  The *de novo* standard applies only to objections which are both timely and specific.  *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984).

14

Although the review is *de novo*, the court may rely on the magistrate judge's recommendations do the extent it deems proper. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Goney*, 749 F. 2d at 7. The court may accept, reject, or modify, in whole or in part, the findings made by the magistrate judge. 28 U.S.C. § 636(b)(1).

Plaintiff's objections require the Court to consider exhaustion of administrative remedies generally and as applied here. The disposition of the objections includes the determination of whether DC-ADM 001 was an available administrative remedy generally and as applied in this case and whether DC-ADM 804 was available to Plaintiff.

As a general matter, Plaintiff raises allegations that implicate his Eighth Amendment right to be free of cruel and unusual punishment in his Amended Complaint. (*See* Doc. 28.) Focusing on his claims of abuse that are the crux of his case, it is well recognized that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000). The Supreme Court has also recognized that sexual assaults on inmates by prison personnel constitute Eighth Amendment violations. *Farmer v. Brennan*, 511 U.S. 825 (1994).

An inmate has access to federal court to raise a claim of

15

deprivation of constitutional rights by prison personnel at a state institution pursuant to 42 U.S.C. § 1983 which must be grounded in a state actor's deprivation of rights and privileges secured by the Constitution or laws of the United States.  However, a prisoner's ability to exercise his § 1983 right to bring his constitutional deprivation claims in federal court is circumscribed by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.

The PLRA specifically provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

The question here is whether Plaintiff exhausted such remedies as were available to him regarding the allegations contained in his Amended Complaint.  With Plaintiff's multiple claims and filings, the answer to this exhaustion question is not a simple one.

## A.   *Prison Litigation Reform Act*

To properly exhaust administrative remedies, the inmate "must 'complete the administrative review process in accordance with the applicable procedural rules,' . . . rules that are defined not by the PLRA, but by the prison grievance process itself.  Compliance with the prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones v. Bock*, 549

16

U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).

An inmate does not have to allege that he exhausted administrative remedies; failure to exhaust administrative remedies is an affirmative defense which must be proved by the defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002); *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). Defendants agree that they "have the burden of proof by a preponderance of the evidence. . . . Failure to exhaust is proven if, after considering all evidence in the case, that Defendants have succeeded in proving that the required facts are more likely so than not so." (Doc. 96 at 7 (citing Third Circuit Model Civil Jury Table of Contents and Instructions 1.10).)

Finding that the district court did not err by acting as the fact finder because exhaustion constitutes a preliminary issue for which no right to a jury trial exists, the Third Circuit Court of Appeals held that "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Small v. Camden County*, 728 F.3d 265, 271 (3d Cir. 2013).[9]

_____

[9]   *Small* agreed with the reasoning of the Second, Fifth, Ninth and Eleventh Circuits. 728 F.3d at 271. Stating that "[m]atters of judicial administration often require judges to decide factual disputes and the Seventh Amendment is not implicated as long as the facts are not bound up with the merits of the underlying dispute," *id.* (citing *Messa v. Goord*, 652 F.3d 305, 308-09 (2d Cir. 2011), *Small* noted that the plaintiff did "not suggest that the facts relating to his exhaustion of administrative remedies or his failure to exhaust are at all intertwined with the merits of the

Regarding § 1997e(a)'s exhaustion language, the Supreme Court observed in *Ross v. Blake*, 136 S. Ct. 1850 (2016), "that language is 'mandatory.'" *Id.* at 1856 (citations omitted). However, as *Ross* goes on to explain, "that edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Id.* "[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain some relief for the action complained of." *Booth v. Churner*, 532 U.S. 731, 738 (2001). *Ross* reviewed "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." 136 S. Ct. at 1859.

First, "an administrative procedure is unavailable when (despite what regulations or guidance may promise) it operates as a simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (citing *Booth*, 532 U.S. at 736, 738). For example, "'where the relevant administrative procedure lacks authority to provide any relief,' the inmate has 'nothing to exhaust.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 736, and n.4).

Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary

his claims." 728 F.3d at 270.

18

prisoner can discern or navigate it. . . . When rules are so confusing that no reasonable prisoner can use them, then they're no longer available." 136 S. Ct. at 1859 (internal quotation omitted). *Ross* went on to explain that

> [t]he procedures need not be sufficiently "plain" as to preclude any reasonable mistake or debate with respect to their meaning. . . . When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is . . . essentially "unknowable"--so that no ordinary prisoner can make sense of what it demands-- then it is also unavailable. . . . Accordingly, exhaustion is not required.

136 S. Ct. at 1859-60 (citations omitted).

Third, exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 136 S. Ct. 1860. The Court further explained this third situation, first referencing *Woodford v. Ngo*, 548 U.S. 81 (2006), where the Court

> recognized that officials might devise procedural systems (including blind alleys and quagmires just discussed) in order to "trip[] up all but the most skillful prisoners." 548 U.S. at 102, 126 S. Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. All of those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable. And then, once again, § 1997e(a) poses no bar.

*Ross*, 136 S. Ct. at 1860.

Because of questions about the state's grievance process, particularly the relationship between the standard grievance process and a related investigation process which investigated allegations of employee misconduct including claims of excessive force, the Court remanded the case for further consideration of whether the inmate had "available" remedies to exhaust. 136 S. Ct. at 1855, 1860-62.

In *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148 (3d Cir. 2016), the Court of Appeals for the Third Circuit cited *Ross* as confirming the Circuit's decision in *Brown v. Croak*, 312 F.3d 109, 113 (3d Cir. 2002), which "held that when prison officials thwart a prisoner's efforts to exhaust his administrative remedies, they render them unavailable." *Id.* at 153 (internal quotation omitted). *Robinson* went on to agree with five sister courts which held that a prison's failure to timely respond to an inmate's properly filed grievance renders its remedies "unavailable." 831 F.3d at 153 (citations omitted.). In so doing, *Robinson* referenced the Circuit's decision in *Small v. Camden County*, 728 F.3d 265 (3d Cir. 2013), where

> an inmate submitted two grievances "in compliance with [the prison's] procedures," but "no decision" was rendered on either of them and prison rules required inmates to wait for a decision before filing an appeal. 728 F.3d at 273. We reasoned that "[b]ecause [the prison's] procedures did not contemplate an appeal from a non-decision, when [the

> inmate] failed to receive even a response to
> the grievances . . . much less a decision as
> to those grievances, the appeals process was
> unavailable to him." *Id*.

831 F.3d at 154. The facts in *Robinson* show that the plaintiff pursued his claim correctly at every step but SCI-Rockview failed to respond within its self-imposed deadline and refused to update him on the status of his grievance after receiving three requests to do so. *Robinson* noted that "[a]s in *Small*, filing suit was Robinson's only method to advance his claim since SCI-Rockview prohibited inmates from filing appeals prior to receiving a decision." 831 F.3d at 154. The Circuit Court concluded the District Court had erred in finding that SCI-Rockview's response "which was provided more than four months late and six weeks after Robinson filed suit and did not even address the correct incident-- rendered the prison's administrative remedies 'unavailable' to him under the PLRA." *Id.* Commenting on the importance of the proper administration of the grievance process, the Court noted "[i]f prisons ignore or fail to fully investigate allegations of abuse, prisoners will feel disrespected and come to believe that internal grievance procedures are ineffective," and this belief in the end may "tax[] the judicial resources that Congress meant to conserve by passing the PLRA."[10]  *Id.* at 155.

_____

[10]  Following this observation, *Robinson* noted the "hope that the events that transpired in this case are not reflective of the way in which SCI Rockview responds to inmate grievances generally." 831 F.3d at 155.

**B.**   ***Exhaustion of Adminstrative Remedies in Pennsylvania Prisons***

As set out in the background section of this Memorandum, the Pennsylvania Department of Corrections "Inmate Grievance System," DC-ADM 804, spells out the procedures an inmate is to follow to file grievances and the "Inmate Abuse" policy, DC-ADM 001, outlines procedures for reporting allegations of abuse.   Neither the policies themselves nor DOC/SCI-Rockview written materials definitively resolve the issue of whether DC-ADM 001 is an alternative method of exhausting administrative remedies for claims of abuse.

A panel of the Court of Appeals for the Third Circuit noted that the Circuit Court

> has not considered whether a Pennsylvania prisoner can exhaust his administrative remedies through DC-ADM 001, nor what steps would be necessary under that procedure.   But even if we were to agree with the various District Court opinions holding that an inmate need only file a grievance with OPR under DC-ADM 001 in order to exhaust administrative remedies, we do not agree that a prisoner can file a complaint before the OPR's investigation is complete, at least absent special circumstances.

*Victor v. Lawler*, 565 F. App'x 126, 129 (3d Cir. 2014) (not precedential).[11]   Many District Court opinions in Pennsylvania have

---

[11]   *Robinson* noted that, at the time the plaintiff suffered his injury (October 2009), the DOC had two policies governing the reporting of abuse by inmates, DC-ADM 001 and DC-ADM 804.   831 F.3d at 150.   After noting the three ways an inmate could report abuse under DC-ADM 001, the Court stated that "Robinson could have brought his complaint to the attention of prison authorities either

found that allegations of abuse do not have to be filed through all levels of the DC-ADM 804 system if the inmate reports abuse through DC-ADM 001. In most instances, the opinions initially assumed DC-ADM 001 to be an alternative to DC-ADM 804 when an inmate is claiming abuse. *Pressley v. Huber*, Civ. A. No. 3:08-CV-0449, 2017 WL 1062375, at *4, 6 (M.D. Pa. March 21, 2017)[12] (citing *McCain v. Wetzel*, Civ. A. No. 1:12-CV-0789, 2012 WL 6623689, at *6 (Oct. 26, 2012)); *McKinney v. Zihner*, Civ. A. No. 1:CV-01-2088, 2010 WL 1135722, at *6-7 (M.D. Pa. Mar. 23, 2010); *Knauss v. Shannon*, Civ. A. No. 1:CV-08-1698, 2010 WL 5698929, at *7-8 (M.D. Pa. Feb. 12, 2010); *Carter v. Klaus*, Civ. A. No. 1:CV-05-1005, 2006 WL 3791342,

---

by reporting it to a staff member or the OPR (and remain under the strictures of the Abuse Policy), or by filing a grievance in accordance with the Grievance Policy." *Id.* Although the plaintiff had done both, the case analyzed exhaustion under DC-ADM 804. *Id.* at 152-55. Because *Robinson* did not discuss exhaustion under DC-ADM 001, the Court concludes *Victor* is appropriately considered the only Third Circuit guidance on the issue.

[12] Because the defendants did not address exhaustion under DC-ADM 001, the District Court did not render an opinion on whether summary judgment for the defendants was warranted on the plaintiff's excessive force claim where the defendants claimed only that the plaintiff failed to exhaust under DC-ADM 804. *Pressley*, 2017 WL 1062375, at *6. As Defendants note (Doc. 96 at 6), the Court in *Pressley* allowed Defendants to submit an additional motion and brief on the issue of exhaustion through 001, but the Court did so, not because it questioned whether DC-ADM 001 was an alternative remedy, but because the defendants had not addressed exhaustion under that procedure after the plaintiff had cited to DC-ADM 001. 2017 WL 1062375, at *6. At least twice in the opinion, District Judge Malachy Mannion stated that alternate methods were available for Pennsylvania inmates to grieve claims of abuse, i.e., DC-ADM 001. *Id.* at *4, 6.

at *1 (M.D. Pa. Dec. 22, 2006).[13]

Defendants argue that the Middle District cases do not control for several reasons: 1) they predate *Small* which held exhaustion is a question of law for the court to decide; 2) none of the cases involved an evidentiary hearing; and 3) none of these cases contained evidence in the record explaining DOC policies 804 and 001. (Doc. 96 at 1.) Defendants first two arguments do not undermine the proposition that DC-ADM 001 is an alternative avenue of exhaustion in cases of abuse, they go to who decides the issue and when it is decided. With their third argument, Defendants urge the Court to conclude that the cases simply got it wrong because defendants in those cases did not explain the differences between the policies at issue, DC-ADM 804 is the *only* grievance policy, and "what started out as a mistake in *Carter* has now snowballed into a long line of cases that wrongfully hold 001 is an alternative administrative remedy that satisfies the exhaustion requirement." (*Id.* at 5-6.) For these reasons, Defendants request that the Court not follow the cases holding that DC-ADM 001 is an alternative to DC-ADM 804 for exhaustion of administrative remedies dealing with abuse. (*Id.* at 6.)

Plaintiff maintains that, given the state of the law in 2010 and 2011, he should not be penalized for using DC-ADM 001 to attempt to exhaust administrative remedies for claims of abuse.

_____

[13] The cases cited do not present an exhaustive list.

(Doc. 97 at 2-6.)

Without wading into the consideration of whether the numerous cases concluding that DC-ADM 001 was an appropriate method of exhaustion of abuse claims got it wrong, those cases and the Third Circuit panel's *Victor* decision, although not precedential, remain the uncontradicted opinions on the issue. At the time Plaintiff was submitting his inmate requests, letters, and grievances on the matters at issue in this case, *Carter*, *McKinney*, and *Knauss* had concluded that DC-ADM 001 was an appropriate avenue of exhaustion for a Pennsylvania prisoner claiming abuse. *McKinney*, 2010 WL 1135722, at *6-7; *Knauss*, 2010 WL 5698929, at *7-8; *Carter*, 2006 WL 3791342, at *1. Seen in the context of Defendants' current argument, the line of cases cited above at least shows "systemic confusion" and no evidence suggests that this confusion has been addressed by appropriate officials, policy amendment, or the Inmate Handbook. *See Ross*, 136 S. Ct. at 1861-62.

Review of SCI-Rockview Grievance Coordinator Jeffrey Rackovan's testimony shows that he was not able to provide answers to key questions and he could not clarify the interaction between DC-ADM 804 and DC-ADM 001. He generally explained the interaction of DC-ADM 804 and DC-ADM 001 using qualifying terms; he acknowledged confusion regarding the interaction; and he could not definitively say that DC-ADM 001 was not an alternative to DC-ADM 804 for exhaustion of administrative remedies. For example, when

asked at the April 6, 2016, evidentiary hearing whether he was aware of any policy other than DC-ADM 804 by which an inmate could seek a remedy, Mr. Rackovan responded "[t]he DC-ADM 001 is an Abuse Allegation Policy which, I guess, ultimately, they could seek monetary redress through that."[14] (Doc. 81 at 9.) He said "when there's an 001 -- an inmate can file a grievance on abuse, it's still probably handled under 804, but it's kind of an offshoot policy." (*Id.* at 11.) Mr. Rackovan further explained that the Security Office then sends the investigation results to OSII and OSII can choose to further investigate then "they approve the Security Officer's investigation, then it kind of slides back to the grievance. I know this is a little confusing, but it slides back to the Grievance Policy, and the inmate ultimately gets his response to that grievance that he filed." (*Id.* at 12.) He added that, "the inmate gets his response from Security, approved by OSII, and then he can follow his appeals the same way he would with a normal grievance." (*Id.*) When asked whether someone informed the inmate of the result of an investigation if the inmate does not

---

[14] In his testimony, Mr. Rackovan stated that the purpose of the DC-ADM 804 grievance system was "just to give the inmate an avenue to have certain issues addressed that he feels need addressed, depending on what the circumstances might be." (Doc. 81 at 9.) He listed issues typically addressed and, and was asked whether inmates "typically ask for relief, like, in terms of money or return of property." (Doc. 81 at 9-10.) Mr. Rackovan responded: "I don't want to say typically, but that has been known to happen. The policy is written such that, if they ultimately want to get relief, they are supposed to request it in the grievance and then in any subsequent appeals." (*Id.* at 10.)

report the abuse as a grievance under DC-ADM 804 (e.g., by mailing a letter which generates an investigation), Mr. Rackovan said he was not sure because he had "seen different scenarios." (Doc. 81 at 23.) He also said that when a claim of abuse was not filed as a DC-ADM 804, there was nothing in 001 where the result would come back to him to process under 804 for some type of remedy. (*Id*.) When asked by Plaintiff's counsel whether he had "any reason to believe that 001 is not an alternative system that a prisoner can use, in order to satisfy his administrative remedies," he ultimately answered that he could not dispute that. (Id. at 30.)

Review of the testimony of Harold Kertes, the supervising criminal investigator for OSII, shows that he testified more definitively than Mr. Rackovan in some respects, but his testimony did not elucidate certain areas of confusion noted in Mr. Rackovan's testimony. (*See* Doc. 83 at 89-102.) For example, when asked by defense counsel whether there was anything in DC-ADM 001 that permits an investigator who found abuse of an inmate to compensate that inmate with money or provide any type of remedy, Mr. Kertes responded: "No, the 001 specifically directs that back it [sic] to the 804 process, inmate grievance process" (*id.* at 94), but he does not explain how DC-ADM 001 refers an inmate to DC-ADM 804 when the inmate is seeking a remedy and neither the current DC-ADM 001 policy nor the Inmate Handbook reveals such a reference.

Mr. Kertes' explanation of what happens under DC-ADM 804 and

27

DC-ADM 001 when an inmate filed a grievance under 804 alleging sexual abuse back in 2010-2011 further illustrates a lack of clarity.  While Mr. Kertes was clear that all allegations of abuse were investigated no matter how reported and he stated that he does not deal with grievances (Doc. 83 at 96), his comments about the appeal process ("there's a process set out in the 804 where it's considered resolved right in the beginning so it doesn't cut back on the time appeal, and the grievance folks will have to explain that even more" (Doc. 83 at 94)) are, at best, difficult to decipher.  The Court's attempts to make sense of a grievance considered resolved before the abuse is investigated relative to an appeal certainly show that "the grievance folks" need to "explain that even more."  (*Id.*)

The testimony from Mr. Rackovan and Mr. Kertes supports Plaintiff's argument that he should not be penalized for using the DC-ADM 001 policy which courts recognized to be an acceptable method of exhaustion at the time he lodged allegations of abuse. DOC officials have had ample time to clarify the alleged error found in many district court opinions through policy amendment, handbook explanation, or other inmate education tools explaining that DC-ADM 001 *is not* an alternative method of exhausting claims of abuse.  Defendants present no evidence that the DOC has done so and certain aspects of the testimony from Mr. Kertes and Mr. Rackovan indicate that internal confusion on the issue remains.

28

As such, the Court declines Defendants' invitation to categorically reject the finding in numerous cases that DC-ADM 001 offered an alternative to DC-ADM 804 for cases of assault. Based on this record and the arguments presented here, the Court concludes DC-ADM 001 was an appropriate administrative remedy which an inmate could use to exhaust claims of abuse pursuant to the PLRA during the relevant time period. Further, the Court concurs with the Report and Recommendation that the mere act of reporting abuse under DC-ADM 001 does not constitute exhaustion. (*See* Doc. 93 at 10.) Consistent with *Victor* and the purposes of the PLRA, absent special circumstances, the inmate must wait for an investigation to be complete before filing a complaint in federal court.[15]  556 F.

---

[15] The Report and Recommendation found that an inmate may begin the process of exhausting remedies by initiating an investigation under 001. (Doc. 93 at 10.)  However, the Report and Recommendation concluded that "[o]nce notified of the investigation's results, the inmate remains responsible for pursuing redress throughout the prison and Department of Corrections channels." (*Id.*)  While there may be sound reasons to adopt such a procedure, neither the DC-ADM 804 and DC-ADM 001 policies themselves set out this hybrid approach to exhaustion nor does the testimony regarding the interaction of the policies allude to any similar operative practice at SCI-Rockview or OSII.  On the contrary, Mr. Rackovan's testimony that there was nothing in DC-ADM 001 that would direct the investigation result to come back to him to process under DC-ADM 804 (Doc. 81 at 23) basically confirms that there was no mechanism for allegations of abuse filed under DC-ADM 001 to be pursued post-investigation through prison and DOC channels set up for seeking redress in the DC-ADM 804 context. Further, in that the hybrid approach goes beyond what *Victor* suggested and what District Court cases applied, for the reasons discussed in the text, the Court concludes that, at this time, it is the better course not to engraft anything more than *Victor's* notation that a prisoner cannot file a complaint pursuant to DC-ADM 001 exhaustion "before the OPR's investigation is complete, at

App'x at 129; *see Boyer v. Malet*, Civ. A. No. 3:CV-16-0149, 2016 WL 4679013, at *3 (M.D. Pa. Sept. 7, 2016).

## C.   *Exhaustion of Plaintiff's Claims*

Contrary to Plaintiff's objections regarding the appropriate standard and matters of credibility (*see* Doc. 94 at 2; Doc. 95 at 17-19), Magistrate Judge Mehalchick used the standard applicable to questions of exhaustion and properly considered matters of credibility on the issue of DC-ADM 804 appeals pursuant to *Small*, 728 F.3d 265.   The Magistrate Judge did not decide whether Plaintiff's underlying claims of abuse, conditions of confinement, and retaliation had merit--her determinations went only to the filing of appeals regarding those matters.   (*See* Doc. 93.)

The Court concurs with Magistrate Judge Mehalchick that Defendants have satisfied their burden of showing that Plaintiff did not exhaust his claims through DC-ADM 804 regarding any claim for which he received an Initial Review Response indicating that the grievance was rejected or denied at the initial level in that, for those claims, he failed to file appeals to the next level of review and he did not satisfactorily show that he was thwarted from

---

least absent special circumstances." *Victor*, 565 F. App'x at 129. In short, if the Court added the requirement that an inmate filing an abuse claim under DC-ADM 001 was obligated to appeal an adverse investigative decision pursuant to the appeal process set out in DC-ADM 804 with no authority or roadmap in place to advise and guide the inmate through the process, the opacity prohibited in *Ross* would render the process unavailable.  *See* 136 S. Ct. at 1859-60.

doing so.  (Doc. 93 at 14-15.)  Thus, Plaintiff's conditions of confinement claims regarding the deprivation of food, etc., are properly dismissed for failure to exhaust administrative remedies. Similarly, to the extent Plaintiff referred to retaliation by Defendant Granlund or inferred supervisory liability on the part of Defendants Lamas and Eaton in his grievances, these claims are also properly dismissed.

Importantly, this conclusion does not apply to grievances for which Plaintiff did not receive a denial upon initial review (grievance numbers 346858 and 347374 based on the December 6, 2010, alleged physical abuse by Defendant Granlund, and grievance number 355976 based on the February 19, 2011, alleged abuse by Defendants Hall, Perks, and Fisher) or to claims of abuse which are subject to review pursuant to DC-ADM 001 (claims of sexual and physical abuse by Defendant Granlund and claims of physical abuse by Defendants Hall, Perks, and Fisher).  Therefore, the question of exhaustion of the following claims remains: the claim of sexual abuse by Defendant Granlund in the fall of 2010; the claim of physical abuse by Defendant Granlund in December 2010; and the claim of physical abuse by Defendants Hall, Perks, and Fisher in February 2011.

**1.   December 2010 Physical Assault**

*a.   Exhaustion Pursuant to DC-ADM 804*

Plaintiff filed two DC-ADM 804 grievances concerning the alleged physical abuse by Defendant Granlund on December 6, 2010,

within the time frame provided by the policy—Grievance numbers 346858 and 347374 dated December 10 and December 15, 2010, respectively. (Doc. 60-6 at 12, 14.) Defendant Eaton, the head of the Security Office at SCI-Rockview, was assigned as the Grievance Officer for both grievances and the Initial Review Responses were signed by her on January 3 and January 6, 2011. (Doc. 60-3 at 13, 15.) The statement in the responses which indicated that Plaintiff's grievances would be handled in accordance with DC-ADM 001 and would be investigated by the Security Office with the results forwarded to OPR (OSII) was initialed JAR:nja with copies sent to Deputy Horton, Captain Eaton, DC-15, and Mr. Rackovan. (*Id.*)

Plaintiff does not dispute that he did not complete the three-step grievance process outlined by DC-ADM 804. Rather, he argues that DC-ADM 804 was not an available administrative remedy. (*See*, *e.g.*, Doc. 95 at 3.) Therefore, the pertinent issue is whether DC-ADM 804 was "available" to Plaintiff to exhaust his claim of physical abuse by Defendant Granlund.

Under the terms of DC-ADM 804, Plaintiff had to receive a denial of the grievances before he could appeal to the next level of review. (Doc. 60-2 at 15.) He argues that he never received these denials nor was he informed of the results of the investigation the grievances triggered and, thus, no appeal was "available." (*See*, *e.g.*, Doc. 97 at 2 n.4.) Defendants assert

32

that Plaintiff testified at his deposition that he received a response and that it was denied. (Doc. 96 at 8 (citing Doc. 60-7 at 26).)

The Court concludes the testimony cited is far less clear than Defendants posit.[16]  With the conflation of response and denial in

---

[16]  Defendants' counsel asked Plaintiff if he got a denial of the grievance[s] filed in December 2010 after they were referred to OSII for investigation under DC-ADM 001. (Doc. 60-7 at 32.)  After some confusion on what was being asked, Defendants' counsel said "In December 2010, you filed a grievance about the physical abuse. What's your position?  Did you ever get a response after they investigated that or no?" (*Id.* at 32.)  Plaintiff questioned what he meant by "response" and, before receiving an answer, he said "Yeah, yeah, yeah. I understand what you mean now, sir.  They denied me.  They deny everything, these people." (*Id.*) Defendants' counsel then said "Okay.  So they denied the physical abuse grievance also?" (*Id.*)  Plaintiff responded "Yes." (*Id.*) After a few questions about appeals, Defendants' counsel said "Physical abuse, it was denied, and you appealed to the superintendent is what I'm hearing from you." (*Id.*)  Plaintiff responded: "It was denied, sir.  But you know, I remember people getting back to me from Camp Hill, too, saying it was being investigated.  So I don't remember what happened, but I know I kept filing paperwork, doing everything I can to try to help myself out of there and stop what was going on and bring it to the people's attention." (*Id.*)

Plaintiff's expressed confusion at his deposition as to how and when he learned of the results of the investigation and what he did after he learned of the results (*see* Doc. 60-7 at 26) may be relevant and worthy of further exploration when considering Plaintiff's general credibility or the merits of his claims in the future.  However, confusion regarding learning the results of the investigation does not establish receipt of the letter referenced in the OSII summary.  As will be discussed in the text, even if Plaintiff received the OSII letter, Defendants must show that the letter contained specific information about the investigation, what steps Plaintiff could take if he disagreed with the results of the investigation, and that the letter should be considered a denial of the grievances filed in December 2010 regarding the December 6, 2010, physical assault.

the relevant portion of the deposition transcript, the failure to elicit confirmation that Plaintiff received written denials of the relevant grievances, and the failure to point to documentary evidence that the grievances were denied, the cited testimony does not show that Plaintiff received the denials required by DC-ADM 804. For similar reasons, the testimony alone does not support Defendants' assertion that Plaintiff did not properly appeal any denial and, for the reasons discussed below, the Court concludes Defendants have not come close to meeting their burden of showing that Plaintiff should not be excused from failing to fully exhaust his claims, i.e., they have not shown that DC-ADM 804 remedies were "available" to exhaust his claims related to the alleged December 6, 2010, physical abuse by Defendant Granlund.

Defendants' cursory consideration of exhaustion of the December 6, 2010, related grievances (Doc. 96 at 8-9) and their conclusory statements regarding whether administrative remedies were available to Plaintiff pursuant to *Ross* (*id.* at 19) may be enough to find that they have not satisfied their burden of proving by a preponderance of the evidence that Plaintiff failed to exhaust his physical abuse claims against Defendant Granlund under DC-ADM 804. However, the Court will take a more in-depth look at whether DC-ADM 804 was available to Plaintiff in that the record as a whole facilitates such consideration. Because the question of the availability of administrative remedies pursuant to *Ross* requires a

reviewing court to consider factual averments in the context of policy provisions and procedures on the ground from both individual and system-wide perspectives, 136 S. Ct. at 1859-62, and because the parties debate whether Plaintiff received responses to his grievances, the Court will review evidence showing significant differences between what happened here and what the policies and announced procedures provided.[17]

DC-ADM 804 directed that the grievances related to the alleged December 6, 2010, abuse incident were to be entered into the Automated Inmate Grievance Tracking System and handled according to DC-ADM 001, and, if the first notice to the Security Office, the Security Office Staff had thirty working days from the date the grievances were entered into the tracking system to respond. (Doc. 60-2 at 11-12.) DC-ADM 001 also provides that when the grievance is related to an allegation of abuse, the Grievance Coordinator, Mr. Rackovan, was to "issue an Extension Notice" to Plaintiff by

---

[17] In that prisoners have no constitutionally protected right to a grievance procedure, the Court does not suggest that the policies themselves created rights, the review is simply to determine the establishment of facts related to the availability of administrative remedies. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137-38 (1977)(Burger, C.J., concurring) ("I do not suggest that the [grievance] procedures are constitutionally mandated."); *see also Pryor-El v. Kelly*, 892 F. Supp. 261, 275 (D.D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).

"checking the box 'Notice of Investigation.'" (DC-ADM 001 at 1-1.)[18]

Here the grievances were entered into the Tracking System as per the Grievance Chart on December 15th and December 20th (Doc. 60-5 at 2) and were the first notices the December 6, 2010, alleged abuse so responses were due approximately January 26th and 31st 2011. Plaintiff did not receive Extension Notices, but he received Initial Review Responses signed by Defendant Eaton in early January 2011 indicating investigations would be conducted pursuant to DC-ADM 001. (Doc. 60-3 at 13, 15.) The Security Office was to report the allegation of abuse to OSII via e-mail within five business days (DC-ADM 001 at 1-2), and it appears the Security Office did so because OSII had assigned tracking number "X-Ref: 10-A-520(ROC)" no later than January 10, 2011, in that the Tracking System Summary entry of that date uses the number (Doc. 63-1 at 51).

At that point the SCI-Rockview Security Office was to investigate the allegation of abuse and compile a report.

---

[18]   As noted previously and explained in the Background section of the Memorandum, the DC-ADM 001 Policy Statement regarding Inmate Abuse effective November 24, 2014, is presumably the policy referenced at the evidentiary hearing in the judicial notice discussion (Doc. 81 at 62-63) and is the document currently available on the website which the Court reviews here. Therefore, although it is not certain whether specific provisions were in effect at the relevant time, to the extent the Court was asked to take judicial notice of the current policy, absent notation by the parties of specific differences, the Court will assume the relevant policy contained similar provisions.

Investigation notes show that a timely investigation ensued.[19] (Doc. 68 at 4.)

Security Office Investigation notes do not indicate the date it completed the investigation, but it was to have done so within thirty business days of receiving the OSII tracking number. (DC-ADM 001 at 1-3.) Because the Security Office had received the tracking number by January 10, 2011, at the latest (the Memorandum of Interview of that date identified the tracking number (*see* Doc. 68 at 4)), the investigation report was to have been forwarded to OSII no later than thirty business days from then, i.e., February

---

[19] DC-ADM 001 directs that the investigation was to include interview of and written statement from Plaintiff, interview of staff member witnesses and/or potential staff member witnesses (those identified in Plaintiff's interview--COs Anthony and Cecil, Counselor Jackson, and secretary Ms. McGarvey (Doc. 68 at 4)) and obtain written statements from them, interview of Defendant Granlund and a written statement from him, review and preservation of available video footage, and review of all pertinent documentation, including housing log books and medical documentation. (DC-ADM 001 at 1-2.) Investigation notes here include the following: 1) an undated Predication Report stating that the investigation was based on the December 6, 2010, incident; 2) a Memorandum of Interview dated January 10, 2011, which included the information that Plaintiff and Defendant Granlund were the only ones present in the office at the time of the alleged assault but several staff members responded to the assault, and the SCIR Medical Department responded and transported him to medical via the medical cart; and 3) an undated Investigative Insert indicating that, "while closing the investigation," Defendant Eaton ("SCI Rockview Intelligence Captain") received Plaintiff's letter dated January 7th which he had sent to OSII in which Plaintiff "complains about the misconduct hearing appeal process and further Mr. K. Granlund . . . in regards to the alleged incident . . . on December 6, 2010." (Doc. 68 at 3-5.) The Investigative Insert closes by saying "[p]ursuant to the ADM 001 and all reports as set forth during this investigation, these complaints are not warranted and this investigation shall stand as written." (Doc. 68 at 5.)

22, 2011.[20]  If the investigation could not be completed by that date, the Facility Manager/designee was to notify OSII in writing or via e-mail to seek additional time.  (DC-ADM 001 at 1-3.)

The record contains no request for extension.  Therefore, assuming the Security Office forwarded its investigation report to OSII for review by February 22, 2011, OSII was to complete its review of the report by March 15, 2011, (fifteen business days from February 22, 2011) as per DC-ADM 001.[21]  (DC-ADM at 1-4.)  Once the investigation was found satisfactory, OSII was to send a letter to to the Facility Manager (Defendant Lamas) and the Intelligence Gathering Captain (Defendant Eaton) and the "Facility Manager/Designee" (Defendant Lamas or her designee) was to advise Plaintiff of the findings.  (DC-ADM 001 at 1-4, 1-5.)  When the results from the OSII were received, "the assigned Grievance Officer," Defendant Eaton, was to complete the Initial Review Response.  (DC-ADM 001.)

Pursuant to policies, procedures and evidence of record, Plaintiff should have been notified by the SCI-Rockview Security office about the results of the investigation into the December 6,

_____

[20]  Calculations account for holidays like Presidents' Day which fell on February 21, 2011.

[21]  This timing basically comports with the deposition testimony of Defendant Lamas who, upon review of OSII documents, stated that information in the file indicated that as of January 31, 2011, Director Barnacle stated in a letter that as of January 31, 2011, the matter "had yet to be completed" but "the documents were closed on . . . 3/15."  (Doc. 63-1 at 64-65.)

2012, incident by the end of March 2011.  Thereafter, he should have received denials of his grievances from Defendant Eaton, the assigned Grievance Officer.

The documentary record does not contain direct evidence that SCI-Rockview sent an investigation report to OSII, that OSII informed SCI-Rockview personnel that the investigation was satisfactory, or that SCI-Rockview personnel informed Plaintiff of the results of the investigation and provided him with Initial Review Responses indicating that his grievances were denied.

The record supports the conclusion that the notification to Plaintiff did not occur as anticipated by the policies in that Plaintiff continued to seek information about the status of his claim regarding the December 6, 2010, incident: he sent an Inmate's Request to Staff form to Shirley Moore on March 20, 2011 (Doc. 63-1 at 22); he sought help getting information about his claims, including those related to Defendant Granlund's physical abuse, in an "Official Inmate Grievance" addressed to Defendant Lamas and received on May 3, 2011 (Doc. 63-1 at 32); in an Official Inmate Grievance dated June 30, 2011, addressed to Mr. Rackovan, Plaintiff complained that SCI-Rockview had never gotten back to him on some grievances relating to the December 6, 2010, incident (Doc. 60-6 at 38); in a letter dated July 4, 2011, to the OSII director, Plaintiff repeated his allegations about the December 6, 2010, abuse and said SCI-Rockview had overlooked the matter, he had heard

nothing back from OSII, and he awaited OSII's response (Doc. 63-1 at 42-43); and in a grievance dated July 6, 2011, (number 372264), Plaintiff said he had been interviewed about the December 6, 2010, incident, he had asked Lt. Vance for a copy of the statement he had taken but did not get one, and he asked about the investigation of the sexual allegations (Doc. 60-6 at 40). In response to the July 6th grievance, Mr. Rackovan referenced Defendant Eaton's June 30, 2011, response to an Inmate's Request to Staff Member and stated that "both of your allegations have been investigated by the Security Office and reviewed by OSII." (Doc. 60-6 at 41.) In the referenced June 30th response, Defendant Eaton had informed Plaintiff that all of his allegations "either were or are being addressed" (*id.* at 33);

This chronological summary shows that, despite the procedural provisions set out in DC-ADM 804 and DC-ADM 001 and Plaintiff's numerous inquiries after the time he should have been notified, Plaintiff was not notified by any SCI-Rockview personnel about the result of the investigation into the December 6, 2010, alleged assault or the disposition of the two grievances related to the incident. Defendant Eaton, the Greivance Officer assigned to the case and the officer in charge of the SCI-Rockview Security office, testified at her deposition on November 21, 2014, that her statement in June 2011 that all of Plaintiff's "allegations either were or are being addressed" (Doc. 63-1 at 33) would have been made

after referencing the Security Office abuse log (a log of abuse allegations that were turned over to OSII) but she did not remember anything more specific (Doc. 63-1 at 84-86).

The OSII Tracking Summary entry of July 7, 2011, states that a letter was sent to Plaintiff informing him that his allegations were investigated and found unsubstantiated. (Doc. 63-1 at 51.) This appears to be the only documentary indication that Plaintiff may have been notified of the disposition of the investigation initiated as a result of his December 2010 grievances related to the December 6, 2010, alleged abuse. The record does not contain a copy of this letter, evidence detailing the substantive contents of the letter, or verification of its receipt.

Looking at the terms of relevant DOC policies and the facts of this case, several issues raised in *Ross* are relevant. First, "an administrative procedure is unavailable when (despite what regulations or guidance may promise) it operates as a simple dead end--with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct at 1859 (citing *Booth*, 532 U.S. at 736, 738). Here the individuals charged with informing Plaintiff of the results of the investigation and providing a response to his grievances did nothing, even after Plaintiff made several inquiries. Although Defendant Eaton (the person in charge of the Security Office and the assigned Grievance Officer who was responsible for informing Plaintiff of the results

41

of the investigation and providing him with the Initial Review Response to his grievances following the investigation) said she would have looked at Security Office logs to form her response that allegations "were or are being investigated" and Mr. Rackovan, SCI-Rockview's Grievance Coordinator, said that Plaintiff's allegations had been investigated and reviewed, neither of these individuals informed Plaintiff of the results. These responses show a consistent unwillingness on the part of SCI-Rockview personnel to provide Plaintiff relief regarding the allegations lodged in his DC-ADM 804 grievances filed in December 2010 alleging abuse on December 6, 2010. Thus, pursuant to *Ross*, the administrative process operated as a dead end and was unavailable to Plaintiff.

Second, the Court considers whether the administrative scheme operating at SCI-Rockview in cases of alleged abuse was "so opaque that it becomes, practically speaking, incapable of use." 136 S. Ct. at 1859. This is the situation where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* *Ross* added that "When rules are so confusing that no reasonable prisoner can use them, then they're no longer available." *Id.*

The timeline set out above and additional evidence of record point to systemic problems regarding the handling of abuse claims under DC-ADM 804. An in-depth look at the interaction of DC-ADM 804 and DC-ADM 001 shows that DC-ADM 804 was not "available" under

the principles established in *Ross* because the interactive scheme, at least as applied here, was "so opaque" that it was, "practically speaking, incapable of use." 136 S. Ct. at 1859.[22] For the reasons discussed below, this conclusion presents an alternate basis to find that administrative remedies were not available to Plaintiff to exhaust his claims regarding the December 6, 2010, incident.

    The lack of clarity exhibited in the testimony of those

---

[22] In *Ross*, inmate Shaidon Blake alleged that two guards assaulted him and he reported the assault to a senior corrections officer the same day. 136 S. Ct. at 1855. That officer referred the incident to the state prison system's Internal Investigation Unit (IIU) which, under state law, had authority to investigate allegations of employee misconduct, including the use of "excessive force." *Id.* After a year-long inquiry, the IIU issued a final report condemning one of the guard's actions but made no findings with respect to the second guard, Michael Ross. *Id.* In response to Blake's 42 U.S.C. § 1983 action, Ross asserted the affirmative defense that Blake had brought suit without first following the prison's prescribed procedure for obtaining an administrative remedy, the Administrative Remedy Procedure (ARP). *Id.* Blake acknowledged that he had not sought a remedy through the ARP because he thought the IIU investigation served as a substitute for the ARP process. *Id.*

Although the Supreme Court rejected the Fourth Circuit's excusal of exhaustion based on a "special circumstances" exception, the Court concluded that remand was warranted for further consideration of whether Blake's suit was viable on the basis that the prison's grievance process was not in fact available to him. *Id.* at 1856. The discussion of the interaction of policies in *Ross* is instructive. The Court concluded that, given the facts of the case, availability was questionable in part because the interaction between the IIU and the ARP presented "some bewildering features." *Id.* at 1861. The Court questioned why the systemic confusion had not been addressed by appropriate officials and/or why the Inmate Handbook did not spell out the process works and how to navigate it. *Id.* at 1861-62.

individuals charged with administering DC-ADM 804 and DC-ADM 001 is exacerbated when the two individuals' testimony is compared and when their testimony is further compared with the policies themselves and their practical application. For example, Mr. Rackovan's testimony that following OSII's approval of the Security Office's investigation, "it slides back to the Grievance Policy, and the inmate ultimately gets his response to that grievance that he filed" (Doc. 81 at 12) does not appear to be consistent with Mr. Kertes' testimony "it's considered resolved right in the beginning" (Doc. 83 at 94). Mr. Rackovan's additional testimony that "the inmate gets his response from Security, approved by OSII, and then he can follow his appeals the same way he would with a normal grievance" (Doc. 81 at 12), infers that the inmate will be informed of the results in a manner consistent with DC-ADM 804. DC-ADM 804 relates an inmate's ability to appeal a grievance dealing with abuse (which must be handled pursuant to DC-ADM 001) to the inmate's receipt of the Initial Review Response and DC-ADM 001 confirms that the Grievance Officer is to inform the inmate of the disposition of the related grievance after OSII approves the investigation. (Doc. 60-2 at 12; DC-ADM 001 at 1-1.) Setting aside for the moment Mr. Kertes' confusing comments regarding appeal noted above, testimony and policy provision comparison leads to the question of whether a letter from the facility's Security Office or OSII (if OSII investigates the allegations of abuse)

which is not identified as an "Initial Review Response" triggers the inmate's fifteen-day period within which to appeal "an Initial Review Response/Rejection" (Doc. 60-2 at 15).

An additional layer of confusion is illustrated by the handling of the grievances alleging abuse related to the December 6, 2010, incident discussed previously: Initial Review Responses indicated the matter would be investigated in accordance with DC-ADM 001 (Doc. 60-6 at 13, 15); the Grievance Chart indicated these grievances were denied at about the same time that Plaintiff was informed the allegations were being investigated (Doc. 60-5 at 2); and the Grievance Chart indicated that no further action was taken on the grievances (*id.*). These apparent inconsistencies may be indicative of the workings of the "process set out in the 804 where it's considered resolved right in the beginning so it doesn't cut back on the time appeal, and the grievance folks will have to explain that even more" explained by Mr. Kertes (Doc. 83 at 94), but making sense of things is another matter. As the Court previously noted, attempts to make sense of a grievance considered resolved before the abuse is investigated relative to an appeal certainly show that, as Mr. Kertes noted, "the grievance folks" need to "explain that even more." (*Id.*)

Importantly, if the "Initial Review Response" triggers the fifteen-day time period to appeal and the only "Initial Review Response" to the grievance received by the inmate informs him that

45

the matter is being investigated, where is an explanation of how the inmate is to proceed with the grievance process?  No such explanation is found in the policies at issue or in the testimony reviewed above.  As set out previously, here Plaintiff made multiple inquiries about the status of the allegations related to the December 6, 2010, incident and the record does not show that he ever received a letter from the Security Office or the Facility Manager/designee––the former being charged with the responsibility when the Security Office conducted the investigation (as was the case here) as per testimony from Mr. Rackovan and Mr. Kertes, and the latter being charged with the responsiblity as per DC-ADM 001. (DC-ADM 001 at 1-4, 1-5.)  Also as discussed above, the only indication that Plaintiff was informed of the results of the investigation is the July 7, 2011, Tracking System Summary reference to a letter which reportedly advised Plaintiff that "his allegations were investigated and unsubstantiated" (Doc. 63-1 at 51).  The letter itself is not contained in the record and there is no evidence that it was identified as an "Initial Review Response" or contained any other indicia that the letter was the trigger for the inmate's period to appeal to the next level of review.  If this is indicative of standard practice for SCI-Rockview and OSII in handling claims of abuse filed pursuant to DC-ADM 804, "the facts on the ground" demonstrate an almost impenetrable process.  *See* *Ross*, 136 S. Ct. 1859.

46

Whether Plaintiff was thwarted from taking advantage of the standard grievance process set out in DC-ADM 804 "through machination, misrepresentation, or intimidation," *Ross*, 136 S. Ct. at 1860, is also a relevant question because of the lack of communication regarding his DC-ADM 804 grievances and DC-ADM 001 requests which Plaintiff was told were being investigated pursuant to DC-ADM 001. Here, prison officials thwarted Plaintiff from taking advantage of the grievance process through misrepresentation in that they did not inform him of the status of the investigation or provide him denials of related grievances. As found in *Robinson*, an inmate's attempt to use the grievance system is thwarted and unavailable when prison officials do not provide the responses required by the relevant procedures. 831 F.3d 148.

The Court also agrees with *Robinson's* concern about SCI-Rockview grievance handling processes, 831 F.3d at 155, given the consistent obfuscation of the real status of matters related to his grievances and allegations. Even if the SCI-Rockview Security Office had timely submitted its investigation to OSII and OSII had not timely advised SCI-Rockview officials of the results of the OSII review of the Security Office investigation, SCI-Rockview officials, as per the abuse log, would have known the Security Office had completed the investigation and Plaintiff's inquiries should have prompted officials to pursue the matter with OSII. No evidence shows that they did so.

47

For all of these reasons, the Court concludes Defendants have not shown that DC-ADM 804 presented an available remedy for Plaintiff to exhaust his allegations of physical abuse related to the December 6, 2010, incident with Defendant Granlund. Therefore, the claim of physical abuse by Defendant Granlund goes forward.

**b.    Exhaustion Pursuant to DC-ADM 001[23]**

If Plaintiff's December 6, 2010, physical assault claim is considered pursuant to DC-ADM 001 based on his direct reporting of the incident to OSII (initially by letter received by OSII on January 7, 2011 (Doc. 63-1 at 39-40)), the result would be the same in that the letter to Plaintiff referenced in OSII's July 2011 Tracking Summary entry, if received by Plaintiff, would have allowed Plaintiff to file suit pursuant to the Third Circuit panel's decision in *Victor* and relevant decisions in this Court. *See* 565 F. App'x at 129. If the letter was not received or did not adequately inform Plaintiff of the results of the investigation, the lack of response would present a "special circumstance" under *Victor* and/or the DC-ADM 001 remedy would be deemed unavailable pursuant to *Robinson* and *Ross*.

---

[23]    Detailed analysis of DC-ADM 001 in the context of all the legal issues identified in *Ross*, 136 S. Ct. 1859-62, may yield results similar to the Court's DC-ADM 804 analysis.    Although Plaintiff argues the unavailability of DC-ADM 001 based on the opaqueness described in *Ross* (*see*, e.g., Doc. 95 at 15-16) the Court will not engage in such an analysis based on the availability of more direct resolution of the DC-ADM 001 exhaustion issue for all abuse claims in this case.

In sum, Defendants have not met their burden of showing that Plaintiff's allegation of physical abuse by Defendant Granlund on December 6, 2010, must be dismissed for failure to exhaust administrative remedies pursuant to the PLRA. Therefore, this claim properly goes forward.

## 2. **Sexual Allegations**

Plaintiff does not dispute that he did not complete the three-step grievance process outlined by DC-ADM 804 regarding his claim of sexual abuse by Defendant Granlund. (*See*, *e.g.*, Doc. 95 at 3.) Because no evidence suggests that he filed a timely grievance alleging sexual misconduct by Defendant Granlund in the fall of 2010, the Court will limit the analysis to whether Plaintiff exhausted the sexual abuse claim under DC-ADM 001. Defendants did not address this issue, maintaining that DC-ADM 001 did not satisfy the PLRA exhaustion requirement. (*See* Docs. 96, 101.) Although the Court could find that Defendants did not meet their burden of showing a lack of DC-ADM 001 exhaustion, given the interplay of issues in this case, the Court will briefly outline the facts/issues related to exhaustion of the sexual abuse claim under DC-ADM 001, i.e., whether Plaintiff adequately raised the claims and whether he waited for the investigation to be complete before filing his case in this Court or whether the need to do so was excused pursuant to *Victor*, 565 F. App'x at 129.

A review of documents indicates that Plaintiff claims to have

49

raised allegations of sexual misconduct in the fall of 2010, but
the first verifiable claim is found in Plaintiff's January 7, 2011,
letter, which was received by OSII on January 10, 2011. (Doc. 63-1
at 39-40.) The record shows that on the date of receipt OSII faxed
the document to Defendant Eaton at SCI-Rockview to include in their
pending investigation of abuse. (Doc. 63-1 at 51.) The
investigation pending at the time related to Defendant Granlund's
alleged physical abuse discussed above. Unlike the claim of
physical abuse, the record does not show any evidence aside from
inferences and undocumented references that an investigation into
the sexual abuse allegations was conducted by the SCI-Rockview
Security Office or any other DOC entity. On the contrary, the
record shows that no such investigation occurred. Key evidence on
this point includes the undated investigation report referenced in
the physical assault discussion above where Lt. Green stated that
the Plaintiff's letter received by OSII on January 10th says that
Plaintiff's letter

> complains about the misconduct hearing appeal
> process and further complains about Mr. K.
> Granlund (U/M CB Unit) in regards to the
> alleged incident on CB unit on December 6,
> 2010. Pursuant to ADM 001 and all reports as
> set forth during the investigation, these
> complaints are not warranted and this
> investigation shall stand as written.

(Doc. 68 at 5.) This investigation note contains absolutely no
reference to allegations of sexual misconduct contained in
Plaintiff's letter. Other investigation documents are similarly

devoid of any mention of allegations or investigation of sexual misconduct in 2011. (Doc. 68 at 3, 4.)

Further, the OSII Tracking System Summary entry dated January 10, 2011, confirms that Plaintiff's letter included allegations of sexual misconduct by Defendant Granlund and indicates "Complaint faxed to Capt. Eaton to include with their pending abuse investigation." (Doc. 63-1 at 51.) While the Court cannot confirm receipt of the fax based on the summary, the record shows that the SCI-Rockview Security Office was made aware of Plaintiff's sexual misconduct allegations--Defendant Eaton herself received and responded to an Inmate Request from Plaintiff on the issue on at least one occasion. (*See* Doc. 63-1 at 33.)

The record also shows that SCI-Rockview Grievance Coordinator Rackovan was made aware of the allegations with Plaintiff's grievance number 349821 received on January 11, 2011. (Doc. 60-6 at 16.) Mr. Rackovan rejected this grievance on January 11, 2011, for several reasons (*id.* at 17) with no indication that he forwarded the rejected grievance to SCI-Rockview's Security Office for investigation which was the procedure specifically set out in DC-ADM 001. (*See* DC-ADM 001 at 1-1.) Sexual misconduct claims were again raised in grievance number 354666 received on February 16, 2011, and the grievance denial dated March 1, 2011, stated that "the allegations regarding UM Granlund were addressed in Grievance number 349821." (Doc. 60-6 at 1.) Thus, neither of these

grievances triggered an investigation into sexual misconduct by Defendant Granlund pursuant to DC-ADM 001 although DC-ADM 804 stated that a grievance dealing with abuse should be handled under DC-ADM 001.  (*See* Doc. 60-2 at 12.)

Many other documents show that Plaintiff continued to raise his claim of sexual abuse by Defendant Granlund and nothing in the record shows that any action was taken: the Inmate's Request to Staff Member addressed to Ms. Shirley Moore at Camp Hill on March 20, 2011, which included allegations of Defendant Granlund's sexual misconduct (Doc. 63-1 at 22) should have triggered an investigation under DC-ADM 001 but there is no evidence that it did so; Inmate's Request to Staff Member addressed to Defendant Eaton on June 30, 2011, again raised the sexual allegations against Defendant Granlund and she merely responded "[a]ll of your allegations either were or are being addressed" without saying what allegations *were* addressed or what the decision on the allegations had been or what allegations *are being* addressed (Doc. 63-1 at 33); Official Inmate Grievance number 371781 dated June 30, 2011, addressed to Mr. Rackovan, in which Plaintiff stated that he was asking Rockview for an investigation against UM Granlund for sexual abuse, referenced a grievance filed on the issue to Ms. Lamas in October 2010 as well as the December 6, 2010, incident, and asked to be sent "copies of responses on the matters above" was rejected on July 6, 2011 for several reasons and a note at the bottom of the page stated "[i]f

you want an investigation, contact the Security Office" (Doc. 60-6 at 38, 39), a response not consistent with the handling of sexual abuse grievance claims under DC-ADM 001 and DC-ADM 804; Plaintiff's letter dated July 4, 2011, and received by OSII on July 7, 2011, repeated his allegations about Defendant Granlund's physical and sexual assaults and the fact that he had not heard anything from OSII on these matters (Doc. 63-1 at 42-43) and the OSII Tracking Summary indicates only that he was sent a letter advising him that "his allegations were investigated and unsubstantiated" (Doc. 63-1 at 51); and in Official Inmate Grievance number 372264 dated July 6, 2011, Plaintiff reviewed his interaction with Defendant Eaton regarding the sexual and physical abuse claims, and specifically referenced the lack of investigation of his sexual abuse claims (the officer investigating the physical abuse claims would not show him his statement in which he said "how UM Granlund would force me to let him masterbait [sic] me and so on) (Doc. 60-6 at 40)); and Mr. Rackovan stated in the denial of the grievance that the allegations "have been addressed through appropriate DC-ADM 001 and 804 procedures" (Doc. 60-4 at 41).

This evidence shows that Plaintiff undoubtedly adequately raised claims of sexual abuse by Defendant Granlund under DC-ADM 001. It also shows that, despite inferences by Defendant Eaton, Mr. Rackovan, and OSII that the sexual allegations had been investigated, no record evidence confirms that any investigation

actually took place.  Further, if there was no investigation into sexual misconduct allegations, there could be no review of such an investigation by OSII.

This conclusion is bolstered by the testimony of SCI-Rockview personnel that they had not seen any evidence that the sexual allegations were investigated.  Mr. Rackovan stated that he did not see any evidence that these allegations were investigated by the SCI-Rockview Security Office or OSII.  (Doc. 81 at 31-32.)

Defendant Eaton, the individual in charge of the Security Office which would have conducted the investigation, stated that an inmate who had made an allegation of improper sexual contact with a staff member would have been interviewed and she had no recollection of interviewing Plaintiff or Defendant Granlund. (Doc. 63-1 at 81.)  Defendant Eaton said she would have referenced the Security Office log in formulating her response that "All of your allegations either were or are being addressed. " (Doc. 63-1 at 83.)  She confirmed that at the time she wrote her response "it looks like" she would have been familiar with Plaintiff's allegations of being sexually abused and she believed at the time that the allegations were being or had been addressed but she had no idea at the time of her deposition how they had been addressed. (*Id.* at 84-86.)

Initially Defendant Lamas pointed to the OSII's close of the investigation report as a document which showed that the DOC had

investigated Plaintiff's allegations of sexual abuse. (Doc. 63-1 at 63, 65.)  However, after reviewing an OSII file to see if anything indicated that OSII investigated the sexual allegations, Defendant Lamas could not point to anything specific.  (*Id.* at 65-66.)

Because Plaintiff raised the allegations of sexual abuse in accordance with DC-ADM 001, ordinarily receipt of the investigation results before filing suit was the only other thing that needed to happen before the federal claim would be considered properly filed pursuant to *Victor*.  565 F. App'x at 129.  The fact that the matter was never investigated certainly presents a "special circumstance" under *Victor*, *id.*, and pursuant to *Ross* and *Robinson*, administrative remedies regarding the sexual abuse claim would be deemed unavailable to Plaintiff.  136 S. Ct. 1850, 831 F.3d 148. Therefore, Plaintiff's claim of sexual abuse by Defendant Granlund goes forward.

### 3.   February 2011 Abuse Allegations

As with his claims of physical abuse by Defendant Granlund in December 2010, Plaintiff attempted to use DC-ADM 804 to address his allegations of abuse by Defendants Hall, Perks, and Fisher regarding the February 19, 2011, chemical incident.  He did so initially  with the filing of grievance number 355976 dated February 23, 2011.  (Doc. 60-6 at 24.)  He also reasserted the allegations in numerous other filings.  (*See*, e.g., Docs. 63-1 at 26, 60-6 at 32, 33.)  Thus Plaintiff's February 19, 2011, abuse

allegations will be considered pursuant to DC-ADM 804 and DC-ADM 001.

*a.*    ***Exhaustion Pursuant to DC-ADM 804***

In the timely-filed grievance dated February 23, 2011, and stamped as received on February 28, 2011, Plaintiff claimed that the three corrections officers poured chemicals into his cell (CO Hall said "now try that out") and cut off ventilation which caused him to become sick and fall on the floor and eventually be taken to the medical unit.  (*Id.*)

A Grievance Withdrawn form regarding grievance number 355976 dated March 21, 2011, signed by G. Dyke, the assigned Grievance Officer, contained the type-written statement: "Inmate Moore elected to withdraw this grievance."  (Doc. 60-6 at 25.)  No reason is provided.[24]  (*See id.*)  A copy of this form was sent to the Grievance Coordinator, Mr. Rackovan.  (*Id.*)

Ordinarily this would end the DC-ADM 804 exhaustion question because a withdrawn grievance cannot be appealed (Doc. 60-2 at 10-11) but, in this case, Plaintiff alleges that he was thwarted from exhausting his administrative remedies because his signature was forged on the Grievance Withdrawn form (Doc. 95 at 7).[25]  Defendants

---

[24]  DC-ADM 804 provides that the form "must . . . identify . . . why the grievance was withdrawn."  (*See* Doc. 60-2 at 10-11.)

[25]  Plaintiff testified that he did not sign the form though he was asked to do so by Lieutenant Gregory Dyke, that Lt. Dyke took his blanket when he wouldn't sign, and Lt. Dyke told Plaintiff he would take care of it himself.  (Doc. 83 at 60-62.)

respond that

> this claim is outrageous and further
> demonstrates Plaintiff's lack of credibility.
> There is no reason for Dyke to risk
> discipline with a forgery and risk
> termination or prosecution by committing
> perjury.
>
> Furthermore, he has no stake in the
> outcome. He is not the subject of a
> grievance or a named defendant. Plaintiff
> simply withdrew the grievance.
>
> Subsequent written inquiries by
> Plaintiff are meaningless. It is not
> uncommon for inmates like Plaintiff make
> [sic] various written assertions, then argue
> their writing is proof of the facts in the
> assertion. Plaintiff is the one with an
> incentive to lie on this issue. His
> voluntary withdrawal is fatal to this
> conditions claim. Therefore, Plaintiff was
> not thwarted from exhausting the alleged
> chemical conditions claim under 804.

(Doc. 96 at 15.)

While Defendants' argument has some facial appeal, a review of

the record shows that it was not just Plaintiff's subsequent

inquiries which should be considered but also Mr. Rackovan's

references to the chemical incident claim and the lack of

consistent documentary evidence on withdrawal. The lack of

consistency in documentary evidence is exhibited by the relevant

Grievance Chart entry which *does not state* that the grievance was

withdrawn. (Doc. 60-5 at 2.) It indicates the following:

grievance number 355976 for problems with staff was received on

March 1, 2011; the "Disposition" and "Complete" columns are blank

as are all others except the "Initial" column containing the word "yes." (*Id.*)

Post March 21, 2011--the date on the Grievance Withdrawn form related to the chemical incident grievance (number 355976)--Mr. Rackovan never referred to the grievance as withdrawn but referenced it in terms of reviewed and responded to: in response to another grievance containing allegations related to the chemical incident (number 359868 dated March 25, 2011), Mr. Rackovan rejected the grievance in part because the issue of the chemical incident contained in grievance number 355976 had been reviewed and answered, Plaintiff was sent a copy of the response, and he had the opportunity to appeal (Doc. 60-6 at 29); and Mr. Rackovan similarly rejected grievance number 360139 dated March 30, 2011, which had again raised the chemical incident (Doc. 60-6 at 32-33).

The Court concludes the conflicting evidence of record renders the Grievance Withdrawn form itself insufficient evidence to support Defendants' burden of showing it is more likely than not that Plaintiff signed the Grievance Withdrawn form and/or intended to withdraw his grievance. Thus, the Grievance Withdrawn form alone does not show that the DC-ADM 804 grievance process was available to Plaintiff regarding the February 19, 2011, chemical incident allegations. This conclusion is based on Plaintiff's averment that he did not voluntarily withdraw his grievance (Doc. 95 at 7 & n.7), the numerous inquiries about the incident

(including complaints about officials' lack of response to the allegations) following the alleged withdrawal, the inconsistencies evidenced by the Grievance Chart, and the inconsistencies discussed regarding Grievance Coordinator Rackovan's references to the allegedly withdrawn document on more than one occasion as if it had been reviewed and denied *(see* Doc. 60-6 at 29, 33).[26]

Given the evidence of record reviewed above, Defendants' failure to address evidence pertinent to the issue of whether Plaintiff was thwarted from filing his chemical incident claim pursuant to DC-ADM 804 demonstrates they have not met their burden of showing that this remedy was available to Plaintiff to pursue this claim. Defendants' conjecture as to why Plaintiff's later filed allegations are "meaningless" (Doc. 96 at 15) and their argument that Plaintiff has shown a general lack of credibility which should be attributed to all of his allegations (*id.* at 16) do not address or outweigh the countervailing evidence discussed.[27] On

---

[26] Although Lt. Dyke and Plaintiff testified about the issue at the evidentiary hearings (Doc. 81 at 53-55; Doc. 83 at 60-62), the particular issue of the grievance being withdrawn was not addressed in the Report and Recommendation. (*See* Doc. 93.)

[27] Defendants' reliance on the Plaintiff's lack of credibility (*see*, *e.g.*, Doc. 96 at 16) and assertion that Plaintiff is crafting disingenuous exhaustion arguments to be able to present "demonstrably false claims" to a jury (Doc. 101 at 5) exemplify their broad-brush approach to what must be a very specific inquiry pursuant to *Ross* and Third Circuit caselaw dealing with exhaustion. As noted previously, Plaintiff's expressed confusion and credibility may be relevant and worthy of further exploration when considering Plaintiff's general credibility or the merits of his claims in the future, *see supra* p. 66 n.5, but the Court rejects

this basis, Plaintiff's claim against Defendants Hall, Perks, and Fisher regarding the February 19, 2011, chemical incident goes forward.

**b. Exhaustion Pursuant to DC-ADM 001**

Considering Plaintiff's allegations under DC-ADM 001, the record clearly shows that he raised the chemical incident allegation as a DC-ADM 001 claim. However, the record does not show that a DC-ADM 001 investigation took place.

Plaintiff specifically raised the chemical incident in terms of DC-ADM 001 on more than one occasion. He first did so in the Inmate's Request to Staff Member form dated March 20, 2011, addressed to Shirley Moore, Secretary, D.O.C. Camp Hill, where he stated that the February 19, 2011, incident was in violation of DC-ADM 001. (Doc. 63-1 at 22.)

In Inmate's Request to Staff Member dated March 30, 2011, addressed to Defendant Lamas, Plaintiff stated that she had told him about two weeks earlier that she would look into his allegations including those concerning the chemical incident (which he asserted was "clearly in violation of DC-ADM 001 . . . excessive force"), that no one was getting back to him "as D.O.C. policy" and nothing was being done to the officers. (Doc. 63-1 at 26.)

the application of the maxim "*falsus in uno, falsus in omnibus*" urged by Defendants (Doc. 96 at 16).

Defendant Lamas responded "[w]hat would be done is internal."[28] (*Id.*)

Grievance number 360139 dated March 30, 2011, included allegations regarding the February 19, 2011, chemical incident and referenced DC-ADM 001. (Doc. 60-6 at 32.)

The April 4, 2011, OSII Tracking System Summary entry indicated that "Inmate Moore claims staff is not feeding him, staff has poured chemicals under his door and that he fell out on the floor and no one helped him or called medical (grievance 355506 - denied, grievance 355976 - withdrawn). ~ Inmate advised his allegations are being investigated and he will be advised of the outcome. X-Ref: 11-A-134 (ROC)." (Doc. 63-1 at 51.) This entry indicates that a new case tracking number was assigned but it does not say who is investigating the claims. (*Id.*) The OSII Tracking System Summary contains no further entries for case tracking number X-Ref: 11-A-134 (ROC) nor does it otherwise reference the associated allegations or investigation. (*See id.*)

On this record, the Court concludes the DC-ADM 001 avenue of relief was also closed to Plaintiff because he raised the chemical incident claims in terms of DC-ADM 001, no evidence shows Mr. Rackovan, Defendant Lamas, or Ms. Moore reported the allegations to

---

[28] Defendant Lamas's cryptic response may indicate that she did not think the matter was appropriate for DC-ADM 001 consideration which would, pursuant to the policy procedures, require reporting to OSII, and "what would be done" would not be "internal." *See* DC-ADM 001.

the Security Office or OSII as was their obligation under DC-ADM
011 (*see* DC-ADM 001 at 1-1, 1-2); no evidence shows that the
investigation referenced by OSII in the April 4, 2011, Tracking
Summary Entry (Doc. 63-1 at 51), or any other investigation ever
took place; and finally, Plaintiff was never informed of the status
of the case OSII opened regarding the February 19, 2011, chemical
incident.[29]   Notably, Defendants do not argue that the chemical
incident claims were not properly the subject of abuse allegations
under DC-ADM 001 or that the matter was investigated at any level.
Therefore, pursuant to *Victor, Robinson*, *Small*, and *Ross*, DC-ADM
001 was not an available administrative remedy and Plaintiff's
claims regarding the February 19, 2011, chemical incident may
proceed against Defendants Hall, Perks, and Fisher.

## IV. Conclusion

The concerns noted previously in the margin about the handling
of claims of abuse at SCI-Rockview, *see supra* p. 22 n.11, are
present for each claim of abuse lodged by Plaintiff.   It appears
that investigations were cursory or nonexistent and officials were
not forthcoming in advising Plaintiff of the status of his claims

---

[29]   As with Plaintiff's other claims of abuse, claims of abuse
regarding the February 19, 2011, incident were not reported to the
Security Office as per policy which provided that any report of
such abuse to a staff member should be reported and, even if a
grievance is rejected, the rejected grievance should be forwarded
to security so an investigation can be initiated.   (DC-ADM 001 at
1-2.)

despite numerous inquiries. While this Court concurs with *Robinson's* expressed hope "that the events that transpired in this case are not reflective of the way in which SCI Rockview responds to inmate" allegations of abuse generally, 831 F.3d at 155, the record here is not indicative of processes which "'afford an inmate a sense of respect'" or treatment of claims with "'seriousness and care'" by prison officials, *id.* (quoting *Nyhius v. Reno*, 204 F.3d 65, 76 (3d Cir. 2000)). Rather, this case is one where the prison appears to have "ignore[d] grievances [and complaints of abuse] or fail[ed] to fully investigate allegations of abuse," 831 F.3d at 155--practices which lead prisoners to "feel disrespected and come to believe that internal grievance procedures are ineffective," *id*. The Court recognizes the difficult task of managing prisons generally and addressing inmate complaints specifically. However, the perfunctory treatment of Plaintiff's claims and inquiries does not serve the expressed purposes of the PLRA. *See Robinson*, 831 F.3d at 155. Significant judicial resources have been expended in addressing the exhaustion issue which, on this record, seems to have been needlessly complicated as a result of the action or inaction of SCI-Rockview personnel.

In sum, Defendants have not met their burden of showing that Plaintiff's central claims are subject to dismissal on exhaustion grounds. As stated by Plaintiff, he alleged that he was sexually abused multiple times by Defendant Granlund, after he stopped the

sexual abuse he was physically abused by Defendant Granlund, and he was held in the RHU for ten months where he suffered further abuse by staff members, including the February 2011 chemical incident. (Doc. 95 at 1.)  For the abuse claims to be dismissed on exhaustion grounds, Defendants had to show by a preponderance of the evidence that remedies were available to Plaintiff regarding his claims of abuse or that he failed to exhaust claims of abuse through DC-ADM 001.  They have not done so.[30]

Therefore, the Magistrate Judge's Report and Recommendation (Doc. 93) is adopted in part.  Plaintiff's claims of sexual abuse by Defendant Granlund in the fall of 2010, physical abuse by Defendant Granlund on December 6, 2010, and physical abuse by Defendants Hall, Perks, and Fisher on February 19, 2011, go forward.  All other claims are dismissed with prejudice.  Therefore, remaining Defendants are Defendants Granlund, Hall, Perks, and Fisher.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: September 21, 2017

---

[30]  Put simply, Plaintiff raised claims of abuse over an extended period alleging that sexual abuse occurring in the fall of 2010 was the root cause of subsequent wrongdoing.  Sexual abuse claims are nasty for the person accused but they are far worse for an inmate who has been abused.  Plaintiff attempted to bring claims of abuse to the attention of SCI-Rockview and DOC personnel for over six months and this record does not establish that he ever received responses.